Your Honor, again, I'm appearing before the plaintiff's appellant, Nathaniel Woods Jr. The issue in this case, again, the district court granted summary judgment. Again, the district court found no prima facie case, and again, held that in any event, there's not a showing of pretext. I thought this fellow wanted a promotion in grade, and the company had a time requirement, just like the federal government. You have to spend so much time as an 11 before you can be a 12, and he just didn't have the time and grade. Well, they allegedly had a time requirement, Your Honor. I'm sorry? They allegedly had a time requirement, and that was true. Well, they had one on paper, but their own investigation, when Mr. Dove, I'm sorry, Mr. Woods filed his complaint, they had an internal investigation. And there are a number of things. On ER 350 is a memorandum from the training officer who stated that strictly no one in the department completed all requirements when they got code advancement. Most of them were advanced by the time of hiring. That was with regard to the alleged qualification training requirements they were supposed to have. Then with regard to the time and grade requirement, their own internal examination and report, and this is at ER 283. Hold on, I'm looking at 350, and what I'm looking for is evidence that they promoted other people without them having the requisite time and grade, and I don't understand what words on 350 say that. On the second paragraph, email, it says here are two lists of the people per requirement. Strictly no one in the department completed all requirements when they got code advancement. And the internal investigation, which is at 283, stated, I'm looking at the bottom of the page in the paragraph five, this is their own investigation, A, it is evident that employees are being advanced inconsistently. Some supervisors are advancing employees based on time and grade, while others were advancing based on time and grade and proficiencies. Some employees have been advanced faster than the guideline state when he or she took initiative to become qualified. And as a result of the investigation into Mr. Wood's complaint, they then put in training and began applying these consistently, at least so they said. My understanding is that the problem with the complaint is that he was not put in a position where he could get the training. Yes. Not that it was or was not followed. I thought that your major objection was that he wasn't put in a position where he could get the training to advance under that, under their rules. Right. That is certain. That's the main issue. I was also addressing the judge's opinion where he said, well, he didn't have his time and grade. When I look at 283 and at the inconsistencies that it mentions in that last paragraph on 283, the critical sentence seems to be some supervisors were advancing employees based on time and grade, while others were advancing based on time and grade and proficiencies. I had thought, and maybe I'm wrong, that that means all the supervisors are requiring time and grade, but for some of them it's not good enough. They're requiring proficiencies on top of time and grade. No. Some people have the requisite, I don't know, one year as an 11 before they get to be a 12, and then they get to be a 12, and other people, they have the year and they still don't get to be a 12. No. If you look at ER 284, the next page, and I'm looking at subparagraph I, where it says about Miriam Mao and Polly Yan, who were two of the primary comparadors. Now, they said they're viewed as top performers, and it states Miriam advanced to a code 12 six months early. And we also put into the record evidence with regard to a white employee, Mr. Cullen, who was also advanced to a 12 before he had spent the two years. Now, the main ---- I'm not objecting to the fact that he was not advanced when he should have been. My understanding is your objection, he wasn't put in a position where he could get the training that he could. Yes. That's exactly right. That is the primary claim, that he was put in a position and never given the training, either the training or job assignments, where he could demonstrate proficiency, which would allow him to get the next job. I thought the main thing he asked for in job assignments was a whole lot of accommodations and schedules so that he could get his schooling, and they kept giving him the accommodations and schedule. Come back to work with a different building and a different boss when he didn't get along with his boss, and they gave him a whole lot of different schedules according to his request so he could get his schooling. Well, coming back to a new position was after all of this had occurred. With regard to the scheduling, he did ask that he could be put, moved into day shift, was sort of straddling two shifts so that he could meet the schooling, and they said no. Day shift when he wanted for his schooling, day shift when he wanted for his schooling. Well, straddle shift when he wanted. The straddle shift is the shift in question. And they said, fine, we'll do this. When you come in early, set up this equipment. And he said, fine, I'll set up the equipment. But the issue is, once his boss came in and he was there for a number of hours after he had set up the equipment, he never got additional assignments that would have given him training and proficiency. Well, but the honest, the facts don't say that. The facts say that because he did not want to come in on any one shift, and that they were therefore giving him a split shift, that they had to lay out the fact, they had to lay out his particular employment responsibilities so that they could cover them all in all shifts, because the real supervisor wouldn't be there on any shift. And then when he got through with those, he would then have some training. That was the question, wasn't it? Well, but the supervisor who would make the assignments came in after Mr. Wood had finished this setting up assignment. So there were another three hours which the supervisor could have given him assignments that would have allowed him training and proficiency. He always was given a checklist. Plus, and this is what's important, is that in January of 2003, he went off the split shift and went to the regular shift time. And he still was not given these assignments that would allow him proficiency and training. He never was. And that's the central problem, that this failure to give him the opportunities for training and to show proficiency which were given to others. How does that time, the January 2003, fit together? I didn't make a timeline with his medical leave and when he left to take a job at another company. In June of 2003, or late June, July, is when he took a medical leave. So there was a period of close to six months where he was fully available. Plus, he had been available even before that for additional assignments, was never given them. He still wasn't given these assignments. It was then these other incidents occurred that put the stress on him and resulted in him deciding to take medical leave. He took medical leave and eventually, when his medical leave ran out and he hadn't been offered a new job yet, he went and got another job at another company because he had to earn some money. Do you want to save any time? Yes, please. Thank you. Thank you, counsel. Jerry Schreibstein again for Bayer. Fairly comparable analysis as in the last matter, there are stated criteria for advancement. There's no dispute that they weren't met. The stated criteria are time and job and proficiencies. There are exceptions, and there's a document in the record at 34 through 37. It's a legacy policy that existed under a prior iteration of a collective bargaining agreement, and it allowed for advancing people if they were proving they were doing really well and establishing proficiencies, the company could deviate from the strict time and job advancement requirements. So the exceptional policy was, in fact, a policy, and there's no proof of violation of that. There are various references in the record to a number of different people, and as an aside, none of whom were similarly situated because none of them had straddle schedules or split schedules or what have you. But you won't find one of them that can be pointed to as deviating from the policy. Miriam Mao and Michael Cullen were both advanced ahead of time and grade requirements, but that's because they had met the job proficiencies. So people were either advanced based on time and job or advanced based on establishing the proficiencies earlier than expected. And there isn't any evidence that Mr. Woods had met the proficiencies for advancement, either on schedule or behind schedule, or that he had sufficient time in the job. So, again, you have a failure in the first instance that he's not qualified for the advancement, which is essentially a failure to promote case. He doesn't get off of first base. Secondly, again, there aren't any, there isn't treatment that's better for someone who's not in the protected class. Everybody else we look at falls into the policy, and or, they're not similarly situated. The papers before the court establish, and as the court's remarks indicate, Mr. Woods was moved from shift to shift to accommodate different studies he was undertaking, some of which were paid for by Bayer. He finally was actually given a shift that didn't even exist. It's a 24-hour operation, so you had your three standard shifts of day, swing, and graveyard. He was given a shift that didn't even exist. They let him come in three or four hours earlier, didn't even have a supervisor there that he was reporting to, so by necessity he was given tasks that were different than some of the other operators. There's nothing in the record to indicate that any training opportunities were either awarded or denied based upon race. What about that January through June period? What do you have to say about that? Well, the January through June 2003, evidently Mr. Woods went and began working a conventional shift along with the rest of the day shift operators. There's evidence in the record that in May of 2003, which was a month before Mr. ---- sorry, I misspoke the name. It was a month before Mr. Woods went out on a medical leave that he talked to Mr. Wong, the supervisor, about training opportunities. So between January and May of 2003, we don't have any indication that there was any reluctance or any even perception on the part of Mr. Woods that he was being disfavored in training opportunities.  Well, if you look at the record evidence on that, you have Mr. Woods' declaration, which is a 242-243, and he talks about going to Wong and evidently not being that satisfied with the answer, but Mr. Wong said to him, according to Mr. Woods, tell me what you need to know and I'll tell you the answer, words to that general effect. Within weeks after that, Mr. Woods is going out on a medical leave from which he never returns, indicating that he has unmanageable workplace stress. So essentially what you had is one instance where, and it's not even clear in the record that there was a specific request for a training opportunity, but one instance when the conversation may have even occurred. And based on that single conversation, one is supposed to extrapolate from that, that Wong was making decisions based upon training opportunities or any workplace issues based upon race. Let's see. If I understand it right, he went into Wong in May and in June. He went to Mueller in June. He went to Gustavo Mueller in June. Yeah. And then he left when? He left in June. Left in June. He left in June. And what's interesting in the record is that Mr. Woods was actually communicated specifically. Did he say that Wong told him he wouldn't give him the training he wanted? No. The declaration of Jean Zhang, which is in the record, and I'll direct the Court's attention to it, Ms. Zhang was a training coordinator, Jean Zhang, I'm probably mispronouncing that, but her declaration is at 17 through 20 and then exhibits 22 through 27. And this is in December of 2002, and it's to Mr. Woods and another operator, Polly Ann. And at this point, she specifically tells Mr. Woods the specific proficiencies he needs to complete for Code 12 advancement. And there's no indication that Mr. Woods ever attempted to achieve those proficiencies, and in the record it's clear if you look at the declarations at 3, 6 and 7 and 19, that it was both the operator's and the supervisor's responsibility to ensure that proficiencies are achieved. If you also look at Mr. Woods' testimony in the record at 67 lines 15 through 20, he acknowledges the operators had the opportunity to ask for training opportunities. So even if you get to the end game here, which is the allegation that he was denied training opportunities or not given training opportunities on the basis of his race, there isn't any evidence of a denied training opportunity, nor is there any evidence that others who were seeking training opportunities not in the protected class were treated in a more favorable way. So the standard for promotion is one that's clearly delineated. They don't have any evidence that it was deviated from. And they don't have any evidence that other people were treated more favorably under the standard. So, again, you have a failure of the prima facie case. If you get beyond the prima facie case, and I don't see that that occurs here, what you're left with essentially are a couple of comments that Mr. Woods attributes to Mr. Wong, which of course are assumed for purposes of this appeal, that Mr. Wong made comments about whether Mr. Woods was taking drugs or in reference to a hard monitor, whether it received AM or FM signals, and then the statement by Dr. Mahler that Bayer has a special way of dealing with minorities. None of those statements in the district court found this has even the overt reference of race. And even if they did, they don't tie into any of the matters at issue before the court. So they're stray remarks. And beyond that, Mr. Woods doesn't have anything to establish a racial intent for any of Bayer's actions. Thank you, counsel. Thank you. Your Honor, Mr. Shrivestein referred to this alleged exception where people do advance for less than two years. But if we lay out in our brief, there's nothing in this record, including the interview or the report that they did, that says that that was the reason these other folks were advanced, and particularly Mr. Cullen, that no explanation was ever given for the fact that he was advanced so quickly. However, the internal investigation that you cite, too, I agree, finds inconsistencies in the training in the department. It did not find discrimination. The reason it did not find discrimination was one African-American employee advanced without time or proficiencies, and one African employee advanced. So they're suggesting that it wasn't discriminatory in any event. That was in another department. That was not under Mr. Wong at all. That was, in fact, Mr. Woods responded to that in his declaration. Those folks were in the department that he came out of where he was able to advance. Now, one other thing. If you get past the prima facie case, I see in this record that this man was promoted twice. Promoted once and retroactively given pay. Yes. And then comes to this particular point. I was looking, if I look for direct evidence, the best I have are the stray comments or remarks. If I look for indirect evidence, I find none. There is no statistical evidence. He's the only one on a straddle day shift. He's the only one who has this particular situation. He's the only one who goes through it. So I'm looking for statistics, and I can't find any because this company, and I'm making this for the questions point. I'm not necessarily suggesting it's my idea. This company leaned over backwards for this guy. He let him go to school. They transferred him to a different shift. They gave him a straddle shift. They promoted him back pay. They did all kinds of stuff like that. So I got no statistical evidence because I got nobody in his position. So the best I can come up with is the stray remarks. Your Honor, there's a couple of things. The promotion he eventually got was based on the work and the job assignments he'd been given in his prior position where almost all the workers were after him, and that was a night shift. That was the one promotion he got. It was not based on anything that happened to him in terms of job assignments or opportunities once he got to the day shift under Mr. Wong. That's number one. Number two, as of January 2003, he was no longer straddling. He was on the regular shift working the regular hours nevertheless. Was that still for Wong? I remember there was one boss he didn't like, and he said so, and they gave him a different building and a different boss. No, that was after he had left and was on sick leave. He was going to be given to him. Came back from the sick leave. If he was to come back, they would not put him under Mr. Wong. I get it. Okay. Now, so for at least six months, during which time he asked Mr. Wong, I need training. Mr. Wong didn't say, I'll give you training, and the record is very clear. If you look at ER 395, Mr. Wong's deposition, Mr. Wong did the job assignments. That was his job. That's what he did. But you're still arguing prima facie case here. You're not going to anything where I can find pretext. That was my question. Well, no, this also goes to pretext because he's the only African American now in this department. Other folks who are not African American are being given training and advancement. He isn't. Once he's made the prima facie case, you know, kind of everything, the question is. I should say I went to Wong and I asked him for training, and he didn't give it to me. I thought what I read just a few minutes ago was I went to Wong and complained of race discrimination and something else, and Wong said, I'll answer any questions you ask me. Well, no, on page 14 of our brief, which is Wood's declaration at ER 242-243, he says on June 1, 2003, which says in May and again in June, I did speak to Mr. Wong about the lack of opportunities to advance, and I wish to receive training that would accomplish that goal. And so the best we have is May. Right. Then he quits in June. This was after a long period of time in which he was never given any training. Mr. Wong was responsible for making the decision each day what jobs each person under him would have. There's absolutely no evidence that anybody who's required talked to him. It doesn't say that Wong turned him down for training. It says, I spoke to Wong about lack of opportunities and I wish to receive training, and Wong said, if there's something you want to know, ask me. Yeah, and then he said, despite my request, Mr. Wong continued to assign me the checklist on a daily basis. Now, what does Mr. What I was looking for there was I asked him for additional training, and he said no. Well, he says, if there's something you want to know, ask me. That's not training. The training is being put in a job, which you can get the experience. Give me the training so I can get a promotion. That's what I'm asking you. That's exactly what he asked. Where does it say that? It says, I did speak to Mr. Wong about the lack of opportunities to advance, and that I wish to receive training that would accomplish that goal. He was asking Mr. Wong to give him the training and job assignments that would allow him to show the proficiency to move up. And Mr. Wong said, if there's something you want to know, ask me. I get it. And then, did you? I had not read it that way, but I understand you're reading now. Okay. Thank you, counsel. Thank you. Thank you. Woods versus Behr is submitted. And we'll hear Graber versus Hewlett-Packard.
judges: Hug, Kleinfeld, Smith